**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ROBERT PEARSON                                                                    PLAINTIFF

v.                                            No. 4:07CV00871 JLH

GROUP LONG TERM DISABILITY PLAN
FOR EMPLOYEES OF TYCO INTERNATIONAL
(US), INC.                                                                        DEFENDANT

## OPINION AND ORDER

Robert Pearson commenced this action pursuant to section 502(a) of ERISA to recover long-term disability benefits allegedly due him under a plan sponsored by Tyco International (US), Inc., the parent company of his former employer. The administrative record has been filed, and both parties have submitted briefs, so this case is ripe for decision. For the reasons stated hereinafter, the Court remands Pearson's claim for long-term disability benefits to Hartford Life and Accident Insurance Company for a determination of eligibility.

## I.

Robert Pearson is a sixty-two-year-old man with a high school education. He was born in April of 1946 and was employed by SimplexGrinnel LP, which is now a division of Tyco International (US), Inc., from June 26, 1966, until November 19, 2001. He began with SimplexGrinnel as a sprinkler fitter installing pipe overhead and underground. After working as a sprinkler fitter for more than eleven years, he became a district construction manager supervising installation crews, a job that he held for twenty-three years. During his last year of employment, he was a district manager. (Adm. R. 506.) Pearson became unable to work due to chronic obstructive pulmonary disease (COPD), which caused severe fatigue and shortness of breath. (Adm. R. 513.) He then applied for disability benefits under the ERISA plan sponsored by Tyco.

Tyco provides disability benefits to employees under a long-term disability plan insured by The Hartford Life and Accident Insurance Company. The plan is an employee welfare benefits plan established pursuant to ERISA. The plan defines "disability" as follows:

> **Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
> 1.      accidental bodily injury;
> 2.      sickness;
> 3.      Mental Illness;
> 4.      Substance Abuse; or
> 5.      pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

(Adm. R. 537.) Thus, a plan participant is initially disabled if he is unable to perform one or more of the essential duties of his occupation, but after the Elimination Period plus twenty-four months a plan participant must be "prevented from performing one or more of the Essential Duties of Any Occupation." The plan defines "Any Occupation" as follows:

> **Any Occupation** means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of 60% of your Indexed Pre-disability Earnings and the Maximum Monthly Benefit shown in the Schedule of Insurance.

(Adm. R. 536.) The Elimination Period is the first 180 consecutive days of disability or the expiration of any employer sponsored short-term disability program, whichever is longer. (Adm. R. 524.) The plan gives Hartford discretion to determine eligibility for benefits and to interpret the terms of the plan. (Adm. R. 536, 539.)

As noted above, Pearson last worked on November 19, 2001.  In April of 2002, he filed an application for long-term disability benefits.  On July 3, 2002, Hartford approved his claim for long-term disability benefits effective May 29, 2002, which was the day after his short-term disability benefits expired.  (Adm. R. 425-26.)  In the letter to Pearson notifying him that his claim had been approved, Hartford wrote, "During the Elimination Period and for the next 24 months, Disability means you are prevented by accidental bodily injury, sickness, Mental Illness, Substance Abuse, or pregnancy, from performing the Essential Duties of Your Occupation . . . .  As of 05/29/04, Disabled means you must be so prevented from performing one or more of the Essential Duties of Any Occupation."

Pearson also applied for Social Security disability benefits.  The claim was initially denied but was approved on appeal by Administrative Law Judge Gary Brewer on June 30, 2003.  (Adm. R. 266-68.)

Hartford requested and received updated claimant questionnaires and attending physician's statements with medical records in April and December of 2003.  Hartford again requested updated medical records during the first five months of 2004 but, so far as the administrative record shows, never received that information.  Despite the fact that it had not received the updated medical information it had requested, on May 20, 2004, Hartford wrote Pearson and informed him that it had determined that he was unable to perform the essential duties of any occupation and so his disability benefits would be continued under the more stringent definition of disability.  (Adm. R. 256.)

Then, on November 27, 2006, Hartford wrote Pearson and told him that he no longer met the policy definition of disability and terminated his benefits effective November 20, 2006.  (Adm. R. 20-26.)  Pearson appealed that determination.  (Adm. R. 12.)  On March 19, 2007, Hartford wrote

another letter to Pearson, again denying his claim and stating, "This is our final determination with respect to the appeal, our record is closed, and no further review will be conducted with respect to this matter." (Adm. R. 3-4.) On September 21, 2007, Pearson commenced this action.

## II.

In the summer of 2002, when Hartford initially granted Pearson's claim for disability benefits under the "Your Occupation" standard, the information available to Hartford showed that Pearson's job as a district manager required him to work at the computer 35% of the day, walk 30% of the day, and stand 35% of the day. (Adm. R. 431, 505.) The most recent spirometry readings in the administrative record were dated November 13, 2001. When tested on that day, Pearson's FVC (forced vital capacity) was predicted to be 4.84, but his "pre-result" was 4.06 and his "post-result" was 3.70. (Adm. R. 441.) A reviewer at Hartford said that these spirometry readings were "severely low" and showed that Pearson was "able to take in air but not expell [sic] it, leaving CO2 in lungs."[1] (Adm. R. 431.) Pearson's treating physicians and the reviewer at Hartford agreed that Pearson had severe fatigue secondary to his COPD, was unable to work, and probably would not improve. (Adm. R. 431, 466.) In addition to fatigue and shortness of breath secondary to the COPD, Pearson had back pain, edema, and sleep apnea. (Adm. R. 431, 458, 459, 460, 467, 468, 469.) Pearson's sleep apnea was sufficiently severe in July 2001 that a physician who performed a sleep study said that Pearson should refrain from operating a motor vehicle until his excessive sleepiness had been eliminated. (Adm. R. 449.)

---

[1] The readings reported by the reviewer actually were from June 11, 2001, but those readings were not substantially different from the November readings. (*Compare* Adm. R. 431, *with* 441, *and* 443.)

Hartford's form for the attending physician's statement of disability designed to accompany an application for long-term disability benefits included a section asking about the level of any psychiatric impairment. In that section asking about the level of any psychiatric impairment, Pearson's treating physician, Dr. Carl P. Griffin, checked the box indicating "Major impairment in several areas – work, family relations. Avoidant behavior, neglects family, is unable to work." (Adm. R. 514.) The nature of the psychiatric impairment was not explained in the attending physician's statement, but the medical records indicated that Pearson had complained about nervousness or anxiety and a lack of energy. (Adm. R. 463.)

As mentioned above, Hartford requested and obtained an updated claimant questionnaire and attending physician's statement of continued disability on April 7, 2003, and December 29, 2003. On April 7, 2003, Pearson stated, "My nerves are very bad. It has been very stressful and depressing since I have become very ill." (Adm. R. 386.) Pearson answered yes to the question, "Have you suffered a severe Cognitive Impairment that renders you unable to perform common tasks, such as using the phone, money management or medication management?" In the space to describe the nature of the impairment, he wrote, "medication management." (Adm. R. 380.) Likewise, Dr. Griffin again indicated in the section of the questionnaire regarding the level of any psychiatric impairment that Pearson had "Major impairment in several areas – work, family relations. Avoidant behavior, neglects family, is unable to work." (Adm. R. 391.) At different times, Pearson was given prescriptions for Lexapro and Alprazolam[2] for depression and stress. (Adm. R. 393, 397, 398.) In his claimant's questionnaire dated December 29, 2003, Pearson continued to complain of COPD,

---

[2] Alprazolam is sold under the brand name Xanax. It is used in the treatment of anxiety and panic disorders.

5

shortness of breath, fatigue, and depression.  (Adm. R. 318.)  Pearson again answered yes to the question, "Have you suffered a severe Cognitive Impairment that renders you unable to perform common tasks, such as using the phone, money management or medication management?"  In the space to describe the nature of the impairment, he wrote, "money management and medication management." (Adm. R. 318.) Dr. Griffin again indicated that Pearson's ability to stand, walk, sit, lift and carry, reach and work overhead, push, pull, drive, and so forth, were all limited by his COPD, and he again indicated that Pearson had a major psychiatric impairment in several areas.  (Adm. R. 326.)  In December 2003, Dr. Griffin completed a functional capacities evaluation form stating that Pearson could sit one hour per day and constantly for one-half hour, could stand one hour per day and constantly for one-fourth hour, could walk zero hours, and could drive one hour per day.  He said that Pearson could occasionally lift up to ten pounds but could never lift more than that and could never climb, balance, stoop, kneel, crouch, walk, crawl, reach, handle, finger, or feel. (Adm. R. 327.) Dr. Griffin stated that Pearson had reached his maximum medical improvement and could never return to work.  (Adm. R. 328.)

As noted above, Hartford made the decision in May 2004 that Pearson was disabled from performing the essential duties of any occupation even though it did not receive updated medical information during the calendar year 2004 before making that decision.

Hartford next obtained an updated claimant questionnaire and an updated attending physician's statement of continued disability in November of 2004.  Pearson reported that he could walk only a small distance due to shortness of breath and weakness of his legs, that he could not climb stairs at all, and that he had great pain in his upper back and sides.  Pearson again answered yes to the question of whether he had a severe cognitive impairment that rendered him unable to

perform common tasks, and he again wrote that those common tasks were money management and medication management. (Adm. R. 231.) Dr. Griffin again reported that Pearson had COPD, severe fatigue, and back pain. He reported that treatment included steroids, inhalers, nebulizer therapy, rest, and avoidance of stress. (Adm. R. 227.) Dr. Griffin again reported substantially the same physical limitations, stated that those physical limitations were not likely to change, and stated that Pearson could not return to work. (Adm. R. 225, 226, 228.) With regard to the psychiatric portion of the questionnaire, Dr. Griffin checked the box to indicate that Pearson had a "Moderate impairment in occupational functioning. Limited in performing some occupational duties." (Adm. R. 228.) On Hartford's form for the attending physician's statement of continued disability, this represented a one level improvement in Pearson's psychiatric impairment rating.

Hartford next obtained an updated claimant questionnaire and attending physician's statement of disability in November 2005. In his claimant questionnaire, Pearson wrote that he had shortness of breath, swelling of ankles and lower legs, pain in his upper and lower back, and chest pain. Pearson again indicated that he had a severe cognitive impairment that rendered him unable to perform common tasks, and he again identified money management and medication management as the common tasks that he could not perform. (Adm. R. 211.) In the attending physician's statement of disability, Dr. Griffin reported that Pearson's primary diagnosis was chronic obstructive pulmonary disease, that he had a secondary diagnosis of severe fatigue, and that he had subjective symptoms of fatigue, cough, dyspnea, and back pain. He reported that treatment included steroids, inhalers, nebulizer therapy, rest, avoiding stress, and limited activity. (Adm. R. 218.) Dr. Griffin again reported that Pearson could sit for one-half hour at a time and a total of one hour a day, could stand for one-quarter hour at a time and for a total of one hour a day, and could walk for one-sixth

hour at a time and for a total of one-half hour for the day. He reported that Griffin could occasionally lift up to ten pounds but could never lift more than that. He reported that Griffin could never drive, climb, balance, stoop, kneel, crouch, or crawl. (Adm. R. 220.) Dr. Griffin again completed the questionnaire to indicate that Pearson had a psychiatric impairment that was a "Moderate impairment in occupational functioning. Limited in performing some occupational duties." (Adm. R. 219.)

Despite the earlier prognoses that Pearson's COPD would not improve, on June 2, 2005, and on March 28, 2006, Pearson had spirometry readings that were interpreted[3] to show normal expiratory flows and a normal FVC. (Adm. R. 123, 125.) On June 2, 2005, Pearson's FVC was predicted to be 4.76, and his "pre-result" was 4.18, while his "post-result" was 4.16. (Adm. R. 124.) On March 28, 2006, Pearson's FVC was predicted to be 4.76, and his "pre-result" was 4.36, while his "post-result" was 4.28. (Adm. R. 126.)

On August 18, 2006, Hartford wrote substantially identical letters to Dr. Griffin and to Pearson's pulmonologist, Dr. Katherine Little, asking:

1.    Would you agree with the following restrictions and limitations for Robert Pearson? (Based on an 8-hour work day).

"No sitting longer than 1 to 3 hours at a time without the ability to get up and stretch or change positions. No more than occasional standing or walking (1-2 hours total per workday). No repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs, twisting or turning. No repetitive lifting, carrying, pushing or pulling greater than 10 pounds occasionally. The patient can perform frequent to constant

---

[3] It is not clear in the record whether the interpretation was made by the technician who administered the test or by Dr. Little, the pulmonologist. The form of the report includes a space for "pre-interpretation" and "post-interpretation." These spaces are marked "N/A" in the 2001 spirometry reports, whereas on June 2, 2005, and March 28, 2006, these spaces said, "normal expiratory flows and a normal FVC." (Adm. R. 123, 125, 442, 444, 491.)

fingering, feeling and/or handling (bilateral upper extremities).  He is able to sit at
a table or desk with his arms supported on the arms of a chair or on a table."

The letters told the doctors that, if they did not agree, they should submit objective data that would support Pearson's inability to work with those restrictions and limitations, including diagnostic test results.[4]  The letter gave the physicians an opportunity to check to agree or disagree with the restrictions and limitations provided.  Dr. Little checked that she agreed.  (Adm. R. 104.)  Dr. Griffin did not check either to agree or disagree.  Instead, he wrote that limitations in pulmonary state should be confirmed by Dr. Katherine Little and that Pearson needed a work hardening program to confirm his limitations.  (Adm. R. 106.)  On September 11, 2006, Hartford sent Dr. Griffin a letter enclosing Dr. Little's letter.  In response, Dr. Griffin indicated that he agreed with the restrictions and limitations provided and also stated in response to a question from Hartford that a functional capacities evaluation was indicated rather than a work hardening program.  (Adm. R. 93.)

Hartford then ordered a functional capacities evaluation, which was performed on October 12, 2006.  (Adm. R. 56-69.)  The report from the functional capacities evaluation stated that Pearson had given a reliable effort with 47 of 47 consistency measures within expected limits and that he had demonstrated consistent effort throughout the evaluation process.  (Adm. R. 57.)  The report described Pearson's functional abilities as follows:

Mr. Pearson demonstrated ability to perform Material Handling Activities at only the
Sedentary level within Occasional lift/carry up to 10 lbs.

---

[4] This Court has noted in another case that Hartford's questions to physicians require additional information from physicians who believe that a plan participant is disabled but no additional information from physicians who believe that a participant is not disabled.  *See Garrett v. Hartford Life and Accident Ins. Co.*, 2007 WL 3374671, at *9 n.1 (E.D. Ark., Nov. 8, 2007).

>Mr. Pearson is able to perform the following activities on a frequent basis: Handling (L), Handling (R), Bi-Manual Handling, Fingering (L), Fingering (R), Bi-Manual Fingering and Sitting.

>Mr. Pearson is able to perform the following activities on an Occasional basis: Walk, Carry up to 10 Lb, Push Cart-20 Lb, Pull Cart-20 Lb, Balance, Stoop, Reach Immediate (L), Reach Immediate (R), Reach Overhead (L), Reach Overhead (R), Reach with 5 Lb. Weight (R or L) and Standing.

(Adm. R. 57.)  For Pearson's functional limitations, the report stated:

>Mr. Pearson did not demonstrate the ability to material handle over 10 lbs.  Mr. Pearson demonstrated lumbar AROM within functional limits with slow and guarded movement patterns.  Mr. Pearson demonstrated poor ability for any repetitive lifting or carrying and demonstrated poor dynamic strength throughout testing. Mr. Pearson demonstrated only being able to walk and stand on an Occasional basis due to his cardiovascular limitations with endurance.  Mr. Pearson demonstrated very poor cardiovascular fitness throughout testing.  He demonstrated having to have multiple breaks due to shortness of breath and fatigue.  Mr. Pearson demonstrated having to use his inhaler on two occasions during the evaluation process.

(Adm. R. 57.)  The report stated its conclusions as follows:

>Overall, Mr. Pearson demonstrated the ability to perform work at the SEDENTARY Physical Demand Classification as determined through the Department of Labor for an 8-hour day with the limitations noted above.

(Adm. R. 57.)  The report then referred to a chart for physical demand characteristics of sedentary work.  The chart showed a physical demand level for sedentary work of 1-10 pounds occasionally, defined as zero to thirty-three percent of the work day, with negligible ability to lift more than that. (Adm. R. 58.)

On November 2, 2006, Hartford wrote Dr. Griffin, sending a copy of the report from the functional capacities evaluation and again asking if he believed that Mr. Pearson could perform a sedentary occupation as defined in the letters dated August 18, 2006, and September 11, 2006.  Dr.

Griffin checked the box to answer yes but wrote in his own hand that the patient "will need to start at fewer hours per day and work upward to 8 hours per day if possible." (Adm. R. 27.)

On November 10, 2006, an employability analysis report was performed using the OASYS (occupational access system), a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles. (Adm. R. 33.) The employability analysis report said that "Pearson possesses the ability to perform his own occupation and one additional occupation based on" the conclusion of the functional capacity evaluation that he could perform sedentary work and his prior work history. (Adm. R. 33.) The report stated that Pearson could work as a branch manager, which was equal to his own occupation of district manager, and as a department manager. (Adm. R. 33.) The report also stated that the national median wage for these occupations ranged from $36.34/hour to $68.48/hour, which exceeded the required earnings potential of $23.76/hour.

On November 27, 2006, Hartford wrote Pearson the letter informing him that disability benefits were terminated effective November 20, 2006. (Adm. R. 20-26.) That letter stated, among other things, that Hartford had "concluded from the combination of all the medical information in your file that you are able to perform a sedentary occupation." (Adm. R. 25.) The letter explained that a Vocational Rehabilitation Clinical Case Manager performed an employability analysis showing that there were occupations for which Pearson was qualified that were within his physical capabilities, that the salaries for those occupations were above 60% of his Indexed Pre-Disability Earnings, as required by the definition of Any Occupation, and included as examples branch manager, with a salary of $36.34 per hour, and department manager, any industry, with a salary of

$68.48 per hour.  Thus, Hartford explained, Pearson no longer was prevented from performing one or more of the essential duties of any occupation, so as of November 20, 2006, he did not meet the definition of disabled.

Pearson's lawyer wrote a letter appealing the decision to terminate benefits.  That letter stated:

> In response to the letter [terminating benefits], be advised that Robert Pearson, by this letter, appeals the decision of the Hartford Life and Accident Insurance Company denying his long-term disability benefits.  To the end we request a full and fair review of his entire claims file.
>
> If, for any reason, you determine this letter is an insufficient notice of appeal please advise immediately as to any deficiency so that the appeal might be consummated in accordance with your requirements.  (Adm. R. 12.)

In response, Hartford wrote a letter that said, "we reviewed all the documents in Mr. Pearson's claim file and the policy provisions."  The letter noted that Pearson had a history of COPD, sleep apnea, anxiety, leg edema, and back pain.  The letter then commented that documentation received in August 2006 revealed that recent pulmonary function tests were basically normal and the chest CT was stable, that Dr. Little felt that Pearson could perform sedentary work, that Dr. Griffin deferred to Dr. Little but believed that a functional capacities evaluation was indicated, that the functional capacities evaluation was performed, and that the functional capacities evaluation demonstrated that Pearson was able to perform full-time sedentary work.  The letter again referred to the employability analysis, stated that Pearson's condition had stabilized and he was able to perform sedentary work, and stated that the appeal was denied.  (Adm. R. 3-4.)

## III.

Section 502(a)(1)(B) of ERISA provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B).  "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) (citing 29 U.S.C. § 1132(a)(1)(B)).  Although ERISA contains no standard of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the "plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989).  Where a plan gives the administrator such discretion, the administrator's decision is reviewed for an abuse of discretion.  *Woo*, 144 F.3d at 1160 (citing *Firestone*, 489 U.S. at 115, 109 S. Ct. at 956-57).

Under the abuse-of-discretion standard, the proper inquiry is whether Hartford's decision was reasonable, that is, whether it was supported by substantial evidence.  *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004).  "Substantial evidence is 'more than a scintilla but less than a preponderance.'"  *Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000)).  "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  An administrator's decision is reasonable if a reasonable person could have reached a similar decision,

given the evidence in the record, not whether the reasonable person would have reached that decision. *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002). Under this standard, the Court should consider only evidence that was before Hartford when the claim was denied. *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003).

To obtain a less deferential review, a plaintiff must demonstrate "that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo*, 144 F.3d at 1160. "To satisfy the second part of this requirement, [the plaintiff] must only show that the conflict or procedural irregularity has 'some connection to the substantive decision reached.'" *Id.* at 1161 (quoting *Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 901 (8th Cir. 1996)). "For heightened review to apply, a beneficiary claiming procedural irregularities must show that the plan administrator, in the exercise of its power, acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision." *Neumann v. AT&T Commc'n Inc.*, 376 F.3d 773, 781 (8th Cir. 2004). "[T]his requirement 'presents a considerable hurdle' for plaintiffs . . . ." *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 679 (8th Cir. 2005) (quoting *Barnhart v. Unum Life Ins. Co. of Am.*, 179 F.3d 583, 588 n.9 (8th Cir. 1999)).

When an ERISA fiduciary determines that benefits are owed but then terminates benefits applying the same definition of disability, "it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002). *McOsker* cited *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840-41 (8th Cir. 2001), where the court required information in the claims record to justify the plan administrator's decision that a change of circumstances

14

warranted termination of the benefits it initially granted.  In *Hairston v. Loctite Corp.*, 2006 WL 568326, at *8 (E.D. Ark. March 7, 2006), this Court interpreted *McOsker* and *Walke* to stand for the proposition that an insurer may not terminate disability benefits without a significant change in the information available to the insurer between the granting and terminating of benefits.

Pearson concedes that this Court should review to determine whether Hartford's decision was an abuse of discretion.  He argues that there is no substantial evidence to support the decision of the administrator, that his physical limitations preclude him from even sedentary work, and that Hartford's decision was arbitrary.

Contrary to Pearson's argument, there is substantial evidence in the record to show that Pearson's COPD improved and that, by itself, Pearson's COPD no longer prevented him from being able to perform the essential duties of sedentary work with the limitations indicated in Hartford's letters of August 18, 2006, to Drs. Little and Griffin.  When Hartford made the decision in May 2004 that Pearson was unable to perform the essential duties of any occupation, it had the spirometry readings from 2001, Dr. Griffin's attending physician's statements in April 2002, April 2003, and December 2003, along with the medical records through that date.  Thereafter, as Hartford has noted, Pearson's spirometry readings showed improvement in 2005 and 2006.  In addition to those readings, Dr. Little, the pulmonologist, answered affirmatively to the question of whether Pearson could perform sedentary work with the limitations specified in the August 18, 2006, letter.  Likewise, the functional capacities evaluation concluded that Pearson had the physical ability to perform sedentary work with those limitations.  Finally, Dr. Griffin agreed that Pearson could perform sedentary work with those limitations, although his agreement was equivocal.  While Pearson disagrees with

15

Hartford's conclusions with respect to his physical ability to perform sedentary work, Hartford's decision in that regard is supported by substantial evidence and is not an abuse of discretion.

Pearson also argues that Hartford failed to address his deteriorating cognitive impairment. In response to that argument, Hartford argues, first, that Pearson did not make this argument in his administrative appeal so the argument is waived and, second, that no physician opined that Pearson's mental faculties were in any way deficient or impaired, and Pearson had failed to submit information from a physician supporting such an assertion.

Taking these arguments in reverse order, Hartford is clearly mistaken in its assertion that no physician opined that Pearson's mental faculties were in any way deficient or impaired.  As mentioned above, every attending physician's statement submitted by Dr. Griffin indicated either that Pearson had a major psychiatric impairment in several areas or that he had a moderate impairment in occupational functioning.  (Adm. R. 219, 228, 326, 391, 514.)  Furthermore, the medical records show that Pearson was taking Xanax at least by July 2001 (Adm. R. 450) and that he was still taking Xanax on June 28, 2006, which is the date of what appears to be the latest medical record in the file.  (Adm. R. 115.)  References to Pearson's anxiety and depression are scattered throughout the physician's notes, but apart from the fact that Lexapro and Xanax were prescribed over the years, there is little in the physician's notes to show the severity of Pearson's anxiety and depression.  The only indication of the severity of any psychiatric impairment is found in the attending physician's statements of disability completed by Dr. Griffin.  As noted above, in 2002 and 2003, Dr. Griffin indicated on the attending physician's statements of disability that Pearson's psychiatric impairment was a major one, whereas in 2004 and 2005 he indicated that Pearson had a moderate psychiatric impairment in occupational functioning and was limited in performing some

16

occupational duties.  In the attending physician's statement of November 2005, which was the last one completed before Hartford decided that Pearson was able to work as a branch manager or a district manager, Dr. Griffin stated that part of Pearson's treatment was "avoiding stress."  (Adm. R. 218.)  Thus, Dr. Griffin repeatedly told Hartford that Pearson had a psychiatric impairment that would limit him in performing occupational duties and did so in the last attending physician's statement before Hartford terminated benefits.

Hartford's other argument is that Pearson waived this issue because he did not assert it in his administrative appeal.  The letter from Pearson's lawyer requesting an administrative appeal did not specify any particular issue to be considered on appeal.  Instead, the letter requested a full and fair review of Pearson's entire claims file and asked Hartford to advise the lawyer immediately of any deficiency if his letter was inadequate.  Hartford did not advise him of any deficiency in his letter or request that he specify the issues that he wanted considered.  Instead, Hartford stated in a responsive letter that it had reviewed "all the documents in Mr. Pearson's claim file."  Hartford's letter made specific mention not only of Pearson's COPD but also his sleep apnea, anxiety, leg edema, and back pain.  Although Hartford specifically mentioned the fact that Pearson's medical records showed a history of anxiety, it did not address the issue of whether the anxiety might impair Pearson's ability to work as a branch manager or a department manager.  On these facts, the Court cannot say that Pearson waived any argument that Hartford should have considered whether he had a psychiatric impairment.

Furthermore, the Court does not agree with Hartford's argument that ERISA section 502(a)(1)(B) requires issue exhaustion. Hartford cites *Wert v. Liberty Life Assur. Co. of Boston, Inc.*, 447 F.3d 1060, 1066 (8th Cir. 2006), and *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770

17

(8th Cir. 2001), but both of those cases interpreted ERISA section 502(a)(1)(B) to require claims

exhaustion, not issue exhaustion.

Hartford also cites, in a surreply brief that the Court has read and considered, *Jacobs v. Xerox*

*Corp. Long Term Disability Income Plan*, 356 F. Supp. 2d 877 (N.D. Ill. 2005).  In *Jacobs*, the court

rejected an estoppel claim that was not presented to the plan administrator, citing *Stark v. PPM*

*America, Inc.*, 354 F.3d 666 (7th Cir. 2004).  *Jacobs*, 356 F. Supp. at 892-93.  In *Stark*, the plaintiff

argued on appeal that he was entitled to a bonus, but he had not exhausted the plan procedures as to

the claim for a bonus.  *Stark*, 354 F.3d at 672.  Although it is not clear that the court in *Jacobs*

intended to say that issue exhaustion, as distinct from claim exhaustion, is required in an appeal

under ERISA section 502(a)(1)(B), if that is what the court in *Jacobs* intended to say, this Court

respectfully disagrees.

In *Wolf v. National Shopmen Pension Fund*, 728 F.2d 182, 186 (3d Cir. 1984), the court held,

"Section 502(a) of ERISA does not require either issue or theory exhaustion; it requires *only* claim

exhaustion."  In *Bahnaman v. Lucent Techs., Inc.*, 219 F. Supp. 2d 921 (N.D. Ill. 2002), the court

held:

> Claims may be waived if not first presented in administrative proceedings.  However,
> a plan participant need only exhaust claims, not theories or issues.  As long as he or
> she has presented the claim to the administrative reviewing body, the participant may
> raise any theory or issue as to the reviewing body's decision being arbitrary and
> capricious.  However, a theory or issue raised in court proceedings must be based on
> evidence or information that was before the reviewing body.

*Id*. at 925 (citations omitted).  More recently, the Tenth Circuit declined to reach the issue of whether

ERISA requires issue exhaustion but nevertheless seemed to approve of the holding in *Wolf*.  *See*

*Forrester v. Metropolitan Life Ins. Co.*, 232 Fed. Appx. 758, 761-62, 2007 WL 1128873, at *2-3 (10th Cir., April 17, 2007).

In *Sims v. Apfel*, 530 U.S. 103, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000), the Supreme Court explained that the basis for a judicially imposed issue-exhaustion requirement for appeals from an administrative agency is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts, so the adoption of such a requirement "depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Id.* at 108-10, 120 S. Ct. at 2084-85. As the Tenth Circuit has noted, ERISA, like the Social Security Act, was meant "'to provide a non-adversarial method of claims settlement.'" *Gaither v. Aetna Life Ins. Co.*, 388 F.3d 759, 774 (10th Cir. 2004) (quoting *Sandoval v. Aetna Life & Cas. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)). The procedure by which an ERISA fiduciary determines a disability claim is far more analogous to the procedure for a Social Security disability claim than to normal adversarial litigation. The proceedings before an ERISA fiduciary, like Social Security disability proceedings, are inquisitional rather than adversarial. *Compare Sims*, 530 U.S. at 110-11, 120 S. Ct. at 2085 ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . .") *with Gaither*, 388 F.3d at 774 ("While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them."). The plan administrator has no representative before the person deciding an ERISA claim to oppose benefits, just as the Commissioner of Social Security has no representative before the ALJ to oppose the award of Social Security disability benefits. *Sims*, 530 U.S. at 111, 120 S. Ct. at 2085. ERISA requires that every employee benefit plan provide a reasonable opportunity for any participant whose claim has been denied for "a full and fair review by the appropriate named

fiduciary . . . ." 29 U.S.C. § 1133(2). That the "full and fair review" is performed by a fiduciary is incompatible with the notion that the proceeding is adversarial in nature. *See Gaither*, 388 F.3d at 774-75. While it would defeat the purpose of this non-adversarial proceeding not to require claim exhaustion, it also would be inconsistent with the nature of the proceeding to require issue exhaustion as though the proceeding were adversarial. *See Forrester*, 232 Fed. Appx. at 762, 2007 WL 1128873, at *3.

Pearson informed Hartford in all of his claimant questionnaires that he believed that he had cognitive impairments that interfered with such daily activities as managing money and managing medication. His treating physician, Dr. Griffin, informed Hartford in all of his attending physician's statements that Pearson had psychiatric impairments that limited him in performing some occupational duties. Hartford did not consider these impairments when it decided that he was capable of being a branch manager or a district manager. When Hartford wrote Pearson to explain the reasoning for its decision to terminate his disability benefits, it made no comment either on his statements in his claimant's questionnaires that he had cognitive impairments or on Dr. Griffin's statements that he had psychiatric impairments in regard to occupational functioning.

In *Abram v. Cargill, Inc.*, 395 F.3d 882, 887 (8th Cir. 2005), the court held that a reviewing court must remand a case when a plan administrator fails to make adequate findings or explain the rationale for its decision. There, the plan administrator had failed to consider the plaintiff's obesity and her Post Polio Syndrome. *Id.* Here, Hartford failed to consider the cognitive or psychiatric impairment mentioned by Pearson in his claimant's statements and by Dr. Griffin in his attending physician's statements. Therefore, the Court will remand this case to Hartford for further consideration of Pearson's claim.

20

Because the claim must be remanded, Hartford should also reconsider the credibility of the employability analysis report.  In 2001, the physician who performed Pearson's sleep study said that Pearson should not drive.  It does not appear from the administrative record that this restriction has been lifted.  In the attending physician's statement of November 2005, which, again, is the most recent attending physician's statement in the administrative record, Dr. Griffin stated that Pearson should never drive.  (Adm. R. 220.)  As Pearson correctly notes, the employability analysis report said that he could return to his own occupation, which required him to drive.  Moreover, his own occupation required that he walk 30% of the day and stand 35% of the day, which the functional capacities evaluation concluded he could not do.  That the employability analysis report concluded that Pearson could return to his own occupation casts doubt on the reliability of the employability analysis report as a whole.  Pearson spent thirty-five years installing sprinkler systems and supervising the installation of sprinkler systems for one company, SimplexGrinnel; he had no other training or experience.  Apparently because he was a district manager during his thirty-fifth year of working in the business of installing sprinkler systems, the employability analysis report concluded that he could work as a branch manager or as a department manager in *any industry*, which is a remarkable leap in logic.  On remand, this issue should be reconsidered.

On remand, Hartford should consider whether the combination of Pearson's impairments, including his physical limitations and any psychiatric or cognitive impairments, preclude him from performing the essential duties of any occupation.  The evaluation cannot be limited to Pearson's COPD.  Although COPD was Pearson's primary diagnosis, it was never his only diagnosis; yet it was the only diagnosis considered by Hartford when it decided to terminate Pearson's long-term

disability benefits.   Hartford should also reconsider the credibility of the employability analysis report.

## CONCLUSION

For the reasons stated above, the decision of Hartford Life and Accident Insurance Company determining that Robert Pearson was no longer eligible for long-term disability benefits is reversed, and the claim is remanded for further proceedings consistent with this opinion.   Hartford must consider not only Pearson's COPD but also other impairments noted in Pearson's claimant statements and in the medical records contained in the administrative record.   Hartford should also reconsider the credibility of the employability analysis report.   Hartford's motion for leave to file a surreply is denied as moot because the Court has considered the surreply.   Document #24.

IT IS SO ORDERED this 3rd day of March, 2008.


_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE